# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2090

_____

Owner-Operator Independent Drivers Association, Inc., also known as OOIDA;
Kuehl Trucking, LLC,

*Petitioners,*

v.

United States Department of Transportation; Federal Motor Carrier Safety
Administration; Anthony Foxx, Secretary of the U.S. Department of
Transportation; T. F. Scott Darling, III, Chief Counsel of the Federal Motor
Carrier Safety Administration; United States of America,

*Respondents.*

_____

Petition for Review of an Action of the
Federal Motor Carrier Safety Administration

_____

Submitted: November 19, 2015
Filed: August 2, 2016

_____

Before COLLOTON, GRUENDER, and SHEPHERD, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The Owner-Operator Independent Drivers Association and one of its members,
Kuehl Trucking, LLC, petition for review of regulatory guidance issued by the

Federal Motor Carrier Safety Administration. The guidance exempts from federal accident-reporting regulations certain accidents involving commercial motor vehicles known as attenuator trucks. Because petitioners have failed to identify a concrete and particularized injury that would give them standing to proceed, we dismiss the petition for lack of an Article III case or controversy.

I.

Congress has directed the Secretary of Transportation to "prescribe minimum safety standards for commercial motor vehicles" and to determine whether individual owners and operators are "fit to operate safely commercial motor vehicles." 49 U.S.C. §§ 31136(a), 31144(a)(1). In assessing owner-operator safety, the Secretary is instructed to consider, *inter alia*, an owner or operator's accident record. *Id.* § 31144(a)(1). The Secretary has delegated his authority to implement these safety standards to the Federal Motor Carrier Safety Administration, an agency within the Department of Transportation. 49 C.F.R. §§ 1.86(a), 1.87(f). Regulations issued by the Administration must be promulgated under the informal rulemaking procedures of the Administrative Procedure Act. 49 U.S.C. § 31136(c) (incorporating 5 U.S.C. § 553).

Exercising this delegated authority, the Administration has developed a comprehensive system for evaluating the safety fitness of commercial motor carriers. 49 C.F.R. § 385.1 *et seq.* Following an on-site examination of the carrier's operations, the Administration rates each carrier as "satisfactory," "conditional," or "unsatisfactory." *Id.* §§ 385.3, 385.9. Carriers that receive an unsatisfactory safety-fitness rating are prohibited from operating commercial motor vehicles. *Id.* § 385.13(a).

In addition to assigning safety-fitness ratings, the Administration maintains the Carrier Safety Measurement System, a database of carrier safety-performance data.

*See* Withdrawal of Proposed Improvements to the Motor Carrier Safety Status Measurement System (SafeStat) and Implementation of a New Carrier Safety Measurement System (CSMS), 75 Fed. Reg. 18,256-02 (Apr. 9, 2010). The System scores carriers' performance in seven safety categories: unsafe driving, hours of service, driver fitness, drug or alcohol violations, vehicle maintenance, hazardous-materials handling, and crash history. The Administration uses scores generated by the System to identify high-risk carriers for on-site compliance reviews and other enforcement interventions, but these scores do not affect a carrier's safety-fitness ratings. *Id.* at 18,257.

The System defines a carrier's "Crash Indicator" measure to quantify "[h]istories or patterns of high crash involvement." A carrier's Crash Indicator has two components: a raw measure of the carrier's crash history and a ranking against comparable commercial carriers. A carrier's Crash Indicator measure is the number of accidents per vehicle, with adjustments made based on the severity and recency of accidents and the miles driven per vehicle.

Each carrier is then placed into a safety-event group of comparable carriers. Safety-event groups are based on two factors. The first is whether the carrier is in the straight-truck or combination-truck segment. A straight truck has all of its axles attached to a single frame, while a combination or "combo" truck consists of two or more frames joined by couplings. A carrier is placed in the combination-truck segment if combination trucks constitute at least 70% of its fleet and in the straight-truck segment if more than 30% of its trucks are straight trucks. The second factor is how many accidents the carrier has sustained over the previous twenty-four months.

Safety-event groups are defined as follows:

| Safety-Event Group | Crashes | Safety-Event Group | Crashes |
|---|---|---|---|
| Combo 1 | 2-3 | Straight 1 | 2 |
| Combo 2 | 4-6 | Straight 2 | 3-4 |
| Combo 3 | 7-16 | Straight 3 | 5-8 |
| Combo 4 | 17-45 | Straight 4 | 9-26 |
| Combo 5 | ≥ 46 | Straight 5 | ≥ 27 |

**Source:** Pet'rs' App. 34

The Administration ranks the carriers within each safety-event group by their Crash Indicator measure. Carriers are ranked on a percentile basis in ascending order. This means that a carrier with a Crash Indicator ranking of 40 has a higher Crash Indicator measure than 40% of the carriers in its safety-event group. Carriers with fewer than two accidents within the last twenty-four months are not placed within any safety-event group. Any carrier that has been accident-free for the previous twelve months is removed from the rankings. Pet'rs' App. 31-34.

Carriers with a Crash Indicator ranking greater than or equal to 65 are identified by the Administration for potential interventions, including warning letters, roadside inspections, investigations, and removal from service. *Id*. at 14; *Frequently Asked Questions*, Fed. Motor Carrier Safety Admin., https://csa.fmcsa.dot.gov/faqs. aspx?faqid=1561 (as visited July 28, 2016, and on file with clerk of court). A subset of a carrier's System data, including its number of accidents, is available on the agency's public website. *See Safety Measurement System*, Fed. Motor Carrier Safety Admin., https://ai.fmcsa.dot.gov/sms/ (as visited July 28, 2016, and on file with clerk of court).

To calculate carriers' Crash Indicator measures, the Administration uses accident reports from state law-enforcement agencies. *See* 49 U.S.C. § 31133(c). For purposes of federal reporting, an "accident" is defined as

> an occurrence involving a commercial motor vehicle operating on a highway in interstate or intrastate commerce which results in: (i) A fatality; (ii) Bodily injury to a person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or (iii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle(s) to be transported away from the scene by a tow truck or other motor vehicle.

49 C.F.R. § 390.5; *see also id.* (defining "crash" as "accident"). An occurrence is considered an "accident" for a carrier regardless of whether the carrier was at fault. *Id.*

On March 18, 2015, the Administration issued "regulatory guidance" concerning accidents involving attenuator trucks. Regulatory Guidance Concerning Crashes Involving Vehicles Striking Attenuator Trucks Deployed at Construction Sites, 80 Fed. Reg. 15,913-01 (Mar. 26, 2015). Attenuator trucks are highway-safety vehicles equipped with an impact-absorbing crash cushion designed to protect workers in construction zones. *Id.* The Administration advised that crashes involving attenuator trucks deployed in work zones "are not considered accidents" and will not "count against the safety performance record of the motor carrier responsible for the operation of the attenuator truck." *Id.* at 15,914. The reason for this exclusion, the Administration explained, is that crashes involving attenuator trucks are expected to occur, and they prevent more serious accidents. *Id.* Effective May 26, 2015, carriers could request to have attenuator-truck accidents removed from their crash record. *Id.*

Petitioners, invoking the exclusive jurisdiction of the courts of appeals to review certain rules promulgated by the Secretary of Transportation, 28 U.S.C. § 2342(3)(A), seek an order vacating the guidance. The Association is a trade association representing approximately 150,000 independent owner-operators, small motor carriers, and professional drivers. Kuehl Trucking, a member of the Association, is a regulated interstate motor carrier headquartered in Chippewa Falls, Wisconsin. Kuehl's safety director, Benn Kingsbury, declared that Kuehl's System report reflects six accidents since December 2013; this record places Kuehl in the safety-event group Combo 2.

The petitioners argue that the Administration violated the Administrative Procedure Act by promulgating a legislative rule without first giving public notice and soliciting comment. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015). The Administration responds that the guidance is an interpretive rule exempt from notice and comment requirements under 5 U.S.C. § 553(b)(A). Alternatively, petitioners argue that the guidance is arbitrary and capricious.

II.

The Administration contends at the threshold that petitioners lack standing to challenge the guidance. Article III limits federal jurisdiction to "Cases" and "Controversies," and there is no case or controversy unless the party initiating the action has standing to sue. *Allen v. Wright*, 468 U.S. 737, 750 (1984).

"[T]he irreducible constitutional minimum of standing" requires the party invoking federal jurisdiction to identify a "concrete and particularized" injury-in-fact that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). This injury must be "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

134 S. Ct. 1377, 1386 (2014). The elements of standing "cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Parties seeking direct appellate review of an agency action must prove each element of standing with specific facts supported by affidavit or other evidence. *Iowa League of Cities v. EPA*, 711 F.3d 844, 869-70 (8th Cir. 2013).

The Association does not assert that it suffered a direct injury caused by the guidance, but contends that it has standing based on injury suffered by its members. An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The disputed issue here is whether the Association can show that at least one of its members would have individual standing. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554-55 (1996).

The only member cited in the petition and opening brief is Kuehl Trucking. Petitioners argue that Kuehl has standing under the doctrine of competitor standing. The theory is that Kuehl Trucking suffered an injury when the Administration lifted a regulatory restriction on its competitors, thus placing Kuehl at a competitive disadvantage. *See Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010); *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008).

Petitioners posit that Kuehl competes with attenuator-truck carriers for favorable Crash Indicator rankings. Because Crash Indicator rankings are calculated as a percentile ranking, petitioners allege that any change in the Crash Indicator methodology is a zero-sum game: a benefit to attenuator-truck carriers must come at the expense of non-attenuator-truck carriers. As scores of attenuator-truck carriers

improve due to the guidance, the argument goes, the scores for other carriers like Kuehl inevitably will decrease. Petitioners contend that if Kuehl receives a lower score, then it is more likely that the carrier will cross the threshold for possible intervention by the Administration. The Administration challenges each step of this analysis.

We conclude that Kuehl has not satisfied the injury-in-fact requirement, because the petitioners have not shown that the guidance will affect Kuehl's ranking. As explained, carriers are assigned Crash Indicator rankings within their safety-event groups. Kuehl is in safety-event group Combo 2, which comprises all combination-truck carriers with four to six accidents in the previous twenty-four months. To establish a competitive injury, Kuehl at a minimum must show that the guidance will cause the Administration to score fewer accidents for attenuator-truck carriers in Combo 2. But Kuehl has not identified a single attenuator-truck carrier in Combo 2, much less a carrier in Combo 2 that stands to benefit from the guidance. The Administration asserts that no carrier in the entire combination-truck segment has benefitted from the guidance. Petitioners bear the burden to establish standing, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148-49 (2013), and they have cited no evidence to rebut the Administration's assertion. Petitioners thus have failed to establish a concrete injury to Kuehl Trucking that would give the Association standing to proceed.

After the question of standing was discussed at oral argument, petitioners submitted a supplemental declaration from the Association's executive vice president. The declaration identified five Association members that operate in the straight-truck segment.[1] Because the Administration asserts that the guidance on attenuator trucks

---

[1]The members are Cheetah Expedited Delivery Inc. (U.S. DOT # 1924678); Maverick Hotshots LLC (U.S. DOT # 2573252); Southwick Delivery (U.S. DOT # 981301); C P R (U.S. DOT # 714450); and Carlos Z Trucking (U.S. DOT # 487446).

has benefitted only carriers in the straight-truck segment, petitioners contend that these five straight-truck carriers have suffered a competitive injury.

As there is no rule of procedure that specifically addresses the timing of submissions to establish standing in agency review proceedings, we will consider the supplemental declaration in this case. We give notice, however, that "a petitioner whose standing is not self-evident should establish its standing . . . at the first appropriate point in the review proceeding." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Post-argument submissions are not an appropriate point in the proceedings to present new evidence to address standing. Future litigants should not expect the court to allow this procedure without a showing of good cause. *Id.* at 900-01.

Having examined the supplemental submission, we conclude that the Association has not established that any of the five entities named in the declaration has suffered an injury-in-fact. The declaration does not state how many accidents, if any, are on each carrier's record. A carrier receives a Crash Indicator ranking only if it has had a minimum of two accidents in the preceding twenty-four months and at least one accident in the previous twelve months. If the carriers had no recent accidents, and thus did not receive a Crash Indicator ranking, then the guidance could not affect any ranking of the five carriers by benefitting other carriers in one of the safety-event groups. With no evidence of recent accidents for these five carriers, petitioners cannot meet their burden to show that the guidance caused a concrete injury to any of the carriers.[2]

---

[2]We also take judicial notice of publicly available reports from November 2015 showing that none of the five carriers sustained an accident in the twelve months before the commencement of this petition for review. *Safety Measurement System—Simple Search*, Fed. Motor Carrier Safety Admin., https://ai.fmcsa.dot.gov/ SMS/Search/Index.aspx (as visited Nov. 25, 2015, and on file with clerk of court); *see* Fed. R. Evid. 201(c); *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 886 (8th Cir. 2015). This means that none of the carriers had a Crash Indicator ranking at the

\*　　\*　　\*

For the foregoing reasons, we conclude that petitioners have failed to establish Article III standing to challenge the disputed agency guidance. The petition for review is therefore dismissed.

_____

point when standing is to be determined. *See Davis v. FEC*, 554 U.S. 724, 732 (2008).